UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

JOSEPH PARSLEY,            )
                          )
v.                        )     Criminal No. 05- 86-P-H
                          )     Civil No.   08-88-P-H
UNITED STATES OF AMERICA,  )
                          )

**RECOMMENDED DECISION ON 28 U.S.C § 2255 MOTION**

Joseph Parsley has filed a 28 U.S.C. § 2255 motion seeking relief after he was convicted

by a federal jury on two marijuana conspiracy offenses and sentenced to two concurrent terms of

87 months of imprisonment.  A prime issue for Parsley is the testimony of one of the individuals

involved in the marijuana operation, Michael Phillips, who cooperated with the Government and

– along with other cooperating witnesses -- attributed certain drug quantities to Parsley when

testifying at Parsley's trial.   After trial and before sentencing, Parsley filed a <u>pro</u> <u>se</u> motion for

appointment of counsel, indicating that he and trial counsel were not seeing eye-to-eye on

sentencing issues and that he desired representation from a public defender.  That motion was

granted by the trial court and Parsley's § 2255 claims include complaints about both the

performance of trial and sentencing counsel. For the reasons that follow, I recommend that the

Court deny Parsley 28 U.S.C. § 2255 relief.

*Discussion*

<u>Strickland v. Washington</u>, 466 U.S. 668 (1984) established the analysis for Sixth

Amendment ineffective assistance of counsel claims.  With respect to Parsley's challenges, I

emphasize three tenants of 28 U.S.C. § 2255 review.   First: "Under the first prong of <u>Strickland</u>,

there is a 'strong presumption' that counsel's strategy and tactics fall 'within the range of

reasonable professional assistance,' and courts should avoid second-guessing counsel's performance with the use of hindsight." Knight v. Spencer, 447 F.3d 6, 15 (1st Cir. 2006) (quoting Strickland, 466 U.S. at 689).   Second, "counsel was under no obligation to raise meritless claims.  Failure to do so does not constitute ineffective assistance of counsel." Acha v. United States, 910 F.2d 28, 32 (1st Cir. 1990) (citations omitted).  And, third, "when, as in this case, a petition for federal habeas relief is presented to the judge who presided at the petitioner's [criminal proceedings], the judge is at liberty to employ the knowledge gleaned during previous proceedings and make findings based thereon without convening an additional hearing." United States v. McGill,11 F.3d 223, 225 (1st Cir. 1993).

**Parsley's 28 U.S.C. § 2255 Grounds**

### 1.     *Structural Error in the Indictment*

In his first 28 U.S.C. § 2255 ground Parsley maintains that there was structural error in the indictment in the omission of drug quantity, contravening the holding of United States v. Booker, 543 U.S. 220 (2005).  He asserts that the prosecution attempted to cure the defect by submitting a jury instruction on a finding of a quantity in excess of 100 kilograms.  In his reply memorandum, Parsley withdraws this ground, acknowledging that there is a valid five-year mandatory minimum sentence in his case.  (Pet'r Reply Mem. at 2.)

### 2.     *Ineffective Assistance of Counsel Claims*

Parsley's second 28 U.S.C. § 2255 contention in his memorandum is that his trial attorney performed ineffectively because he was "laboring under an egregious conflict of interest" in that he had a dual agency with Michael Phillips who was paying Parsley's attorney.  (Sec. 2255 Mem. at 5.)  Parsley believes that as a consequence of this conflict of interest his trial attorney failed to subject the Government's case to a true adversarial test and counsel remained silent when

Phillips perjured himself concerning drug quantities.[1]   He describes Phillips as the primary

witness for the Government and the "genesis of funds which motored" trial counsel's

participation on behalf of Parsley.  (Sec. 2255 Mem. at 7.)  He faults trial counsel for not

recusing himself, not advising the court of the conflict, and not obtaining a waiver from Parsley.

Parsley opines:

> Throughout the proceedings, [trial counsel] insisted that Movant proceed to trial,
> which netted him a substantial fee.  This narcissistic motive, was not necessarily
> in Movant's best interests, as the proffer notes reflected the true amount for which
> Movant was accountable, **in pounds,** not kilograms.  The end result, or prejudice
> to Movant was a Base Offense Level of 28, instead of a Level 26 and the loss of
> an agreement with the Government, for a recommendation for a 3-level reduction
> unde[r] § 3E1.1 for acceptance of responsibility.

(Id.)

　　　　In another of his ineffective assistance grounds, Parsley maintains that this Court

committed sentencing errors when it declined to reduce his base offense level by three for

acceptance of responsibility.  Parsley believes that if the Government had not insisted that

he enter a guilty plea to the enhanced quantity of 750 kilograms and had his trial attorney

not been ineffective Parsley would never have insisted on going to trial.

　　　　The United States has submitted an affidavit by Attorney Maselli, Parsley's

privately retained trial counsel, which represents:

> 2.　　　I am aware of the allegation that Parsley has made that Michael Phillips, a
> Government witness against Parsley at his federal drug trial, paid my fees to
> represent Parsley.
> 3.　　　To my knowledge, Lawrence M. Fisher, Esq. of New York, New York
> was paid $25,000 to represent Parsley on the drug charges.  Thereafter, Fisher

---

[1]　　　In a non sequitur, Parsley further attributed his sentencing attorney's failure to file an appeal for him, even though he was instructed to do so, to this conflict.  In his reply memorandum he withdraws this argument.  (Pet'r Reply Mem. at 22.)  In his § 2255 memorandum Parsley also attempts to tie sentencing counsel to the failure to adequately test Phillip's drug quantity testimony.  Phillips did not testify at sentencing so in terms of sentencing counsel's efforts as to Phillip's testimony, the die was already cast.  I address Parsley's claims concerning his representation during sentencing in the discussion below.

engaged me as local counsel for Parsley.   Later, when Fisher and Parsley disagreed with Parsley's decision to go to trial on the charges, Parsley agreed to retain me as trial counsel.

4.        Information that Michael Phillips may have paid counsel for fees for Parsley first appeared in Jencks materials that the Government disclosed to me before trial.  Also prior to trial, Parsley knew that the Jencks material included information that Phillips paid counsel fees for Parsley.

5.        Michael Phillips did not pay my fees to represent Parsley.

6.        Prior to examining Michael Phillips at Parsley's trial, I never had any contact with Phillips.

7.        I was paid substantially less than $25,000 to represent Parsley at trial.  My understanding was that the payment was the result of Parsley's own earnings and money he borrowed from relatives and friends.

(Maselli Aff. ¶¶ 2-7, Doc. No. 13-11.)

Attached to Parsley's reply is an affidavit executed by him.   Therein he indicates:

2.        William Maselli was originally retained as local counsel by Lawrence Fisher in order that Mr. Fisher might represent me in the criminal trial which forms the basis for the case at bar.

3.        Mr. Maselli's fee to act as local counsel was $2,000.

4.        Acting as local counsel, it was Mr. Maselli's advice that, if I were to abandon my right to trial by jury, the prosecutor would get the weight of marijuana he wanted for sentencing purposes.

5.        It was for this reason that I opted to proceed to trial.

6.        Mr. Maselli charged me an additional $15,000 to represent me at trial.

(Doc. No. 17-2.)

In a reply to Parsley's § 2255 reply, the Government responds that there are three problems with this affidavit.  First, it maintains that Parsley's representation about what his attorney advised him is hearsay.  (Gov't Reply at 1-2, Doc. No. 19.)   Second, the United States contends that "Parsley's sparse and conclusory affidavit is largely self-serving."   (Id. at 2.)   And, third, it argues that at no time does Parsley represent that he was ever prepared to stipulate to a drug quantity that exposed him to the statutory minimum of five years: "Thus, whether or not the precise drug amount should have been litigated at sentencing, absent Parsley's agreement that the statutory minimum applied, the Government had the burden of proving that the drug amount

4

exceeded 100 kilograms of marijuana.  The triggering drug amount could only be established at trial."  (Id. at 2-3.)

In his reply memorandum, Parsley pretty much concedes the Phillips-payment-of-fee-related conflict of interest bent of his motion; he focuses on the Strickland ineffective assistance paradigm, insisting that he was prejudiced by counsel's performance.  (Pet'r Reply Mem. at 3.) See Teti v. Bender, 507 F.3d 50, 55 (1st Cir. 2007).  "The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect." Kimmelman v. Morrison, 477 U.S. 365, 374 (1986).  "To prove deficient performance," in a § 2255 proceeding, "a defendant must establish that counsel was not acting within the broad norms of professional competence." Owens v. United States, 483 F.3d 48, 57 (1st Cir. 2007) (citing Strickland, 466 U.S. at 687-91).  "Furthermore, to prove prejudice, a defendant must establish that but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different."  Id. at 57-58 (citing Strickland, 466 U.S. at 694).

**A.    Advice to go to trial and the availability of an acceptance of responsibility reduction**

In his reply memorandum Parsley maintains that Maselli, "rather th[a]n represent him for a guilty plea, which would have taken only a matter of hours to complete, Maselli wanted to be paid for handling a jury trial which would earn him larger fees" thereby sacrificing a sentence reduction for acceptance of responsibility.  (Pet'r Reply Mem. at 4.)  With respect to the Government's insistence that it was Parsley's choice, Parsley argues that he was not in a

> position to decide the best avenue available to contest the amount of drugs
> attributed to him.  As Mr. Maselli should have been aware, trial was not the
> appropriate venue to contest  the drug weight unless it was Parsley's position that
> he was culpable of less than 100 kilograms of marijuana.  Any amount above that

5

lies strictly within the real of the sentencing judge under the preponderance of the evidence standard…

(<u>Id.</u> at 4-5.)  He cites to his own affidavit statement that Attorney Maselli told him that trial was the best milieu for challenging drug quantity and that if he abandoned his right to trial then the prosecutor would get the weights he wanted.  (<u>Id.</u> at 5-6.)

> Further supporting Parsley's allegation is the notable omission of any claim by Maselli that he advised Parsley of the consequences of going to trial versus the entry of the plea.
> The government has already acknowledged that the stated purpose behind Parsley's insistence on going to trial was due to the fact that he could not reach an agreement with the prosecutor regarding quantities of marijuana attributed to him. The difference between his estimates and the government's were irrelevant, however, in relation to statute wherein both parties agreed that the amount exceeded 100 kilograms of marijuana.  Competent advice, therefore, would be for Parsley to enter an open plea of guilty -  without agreement with the government - and litigate the amounts at sentencing.
> Not only does Maselli not claim to have proposed this option to his client, it would be illogical for him to make such a claim.  Given the advice that it is the judge, not the jury, who determined the drug quantity for sentencing, no reasonable defendant in Parsley's shoes would have proceeded to trial.

(<u>Id.</u> at 6-7.)

During allocution Parsley explained as follows to the Court:

> As far as my trial and accepting responsibility of my crimes, nobody can go to court and say I'm guilty of something I didn't do. In this case, I was guilty for what I did and the prosecutor wanted me to cop out to something that was more than what I felt that I was responsible for, which would have been two points higher on my guidelines. So maybe in some way me choosing to go to trial might have been just so I could get the truth of the facts of the amount of marijuana out there and, you know, it actually did.
> Um, I hoped to freely walk into court, Your Honor -- I thought when I spoke to Mr. Maselli, he spoke to Mr. Perry, my plea bargains had to go through the Government, you know, not through open court. I really wasn't 100 percent sure. If I could have, I'm sure that I would have walked in and said hey, I'm guilty. There is plenty of time I had asked if I could do that, but it was to no avail.

(Sentencing Tr. at 32.)  Parsley does not dispute in his reply memorandum that he and Attorney

Fisher parted ways because Parsley was insisting that he wanted to go to trial and Fisher thought

he should plead guilty.  (See Maselli Aff. ¶ 3.)

     With regards to the decision to proceed to trial and the availability of the acceptance of

responsibility reduction, the United States argues as follows in its reply memorandum:

> Parsley's response to the Government's motion claims that his trial
> attorney's purported insistence that he take his case to trial satisfied the prejudice
> prong of the Sixth Amendment test identified in Strickland v. Washington, 466
> U.S. 668, 687 (1984), because had he pleaded guilty, he would have been eligible
> for a two-level reduction for acceptance of responsibility pursuant to USSG
> §3E1.1.1 That claim fails because the sentence Parsley received after a criminal
> history category (CHC) departure was ordered remained within the Guideline
> range that would have applied even if the court had ordered a USSG §3E1.1
> reduction.
>     Parsley's PSI set his total offense level at 28 and CHC computations at
> CHC III. The result was a Guideline range of 97 to 121 months. The trial court,
> however, concluded that Parsley's CHC score was inflated and thus reduced it to
> CHC II. At total offense level 28, the result was a reduced Guideline range of 87
> to 108 months. Within that range, the court selected the minimum Guideline term
> of 87 months.
>     Even if USSG §3E1.1 had applied to Parsley, his total offense level would
> have been 26. At CHC III, the result would have been 78 to 97 months. At total
> offense level 26 and the reduced CHC II, the range is 70-87 months. As has been
> pointed out, Parsley received a term of 87 months. Nothing in the record suggests
> that the sentencing court believed that any lesser term of punishment than 87
> months was appropriate for Parsley. Thus, Parsley's response fails to show that,
> assuming trial counsel gave the advice Parsley alleges and also that it was
> unreasonable, the outcome of the proceeding would have been different. See
> Strickland, 466 U.S. at 687.

(Gov't Reply Mem. at 3-4)(footnote omitted).

     Parsley does ask too much at this stage of the § 2255 proceeding when arguing that

Attorney Maselli's failure to address his advice to go to trial in his affidavit means that Maselli

concedes that he advised Parsley that the best course was to test drug quantities at trial or that he

never discussed with Parsley the option of an open plea.  It does seem clear from the trial record

that Attorney Maselli's strategy was not to contest drug quantities at trial.  His trial strategy was

geared towards convincing the jury that Parsley was not actually involved in the charged

conspiracy and that the witnesses were pinning conduct on him in the hopes of getting more

lenient treatment by the Government.  For instance, in his closing argument counsel at no time

attempted to persuade the jury that the drug quantity was under 100 kilograms; his thrust was in

trying to discredit Phillips and dissociate Parsley from the conspiracy.  (Dec. 14, 2006, Trial Tr.

at 166-90, Doc. No. 408.)

     By the time he was appointed and was faced with sentencing, the public defender was

stuck with the fact that substantial drug quantities were testified to at Parsley's trial.  Counsel

explained:

> As to the point on remorse, I have seen significant remorse. I did not come
> into this case at a point where Mr. Parsley was meeting with probation so I didn't
> see him in the probation interview. My overview on this case is one of a young
> man who, upon arrest and introduction into the District of Maine and the federal
> system, had a retained attorney from New York. It's not clear to me how that
> individual came in, where he came in, or exactly who hired that individual, but
> that attorney was counsel of record, and it's not evident to me that he did a whole
> lot other than to locate local counsel in the form of Mr. Maselli, who the Court
> knows Mr. Maselli is a vigorous advocate who has tried and used his courtroom
> prowess on many, many cases, but I suggest to you that in some respects, Joseph
> was victimized here because the Court sat through this trial, and from everything
> that I have heard and seen, there was not really a defense at trial. That this was
> the Government going to prove it, and a stream of witnesses came forth indicating
> the role that Mr. Parsley played.
> So it is not at all clear to me what the theory of the defense was other than
> this peripheral claim that well, he did a lot of work for Mr. Phillips so it was a
> mere presence situation.
> In my discussions with Mr. Parsley, it strikes me that it was not clear to
> him that he had the option of just walking into court and pleading guilty. There
> may have been confusion on his part that a plea agreement was necessary in order
> to just enter a plea of guilty.
> I have discussed with Mr. Perry, he has been very candid with me, about a
> meeting that occurred where Mr. Parsley was present in which I believe Mr. Perry
> essentially gave an overview to Mr. Maselli in Mr. Parsley's presence of what Mr.

Perry thought the Government's potential case would be and how, in Mr. Perry's mind, that may play out regarding the trial.

I can only tell the Court that if I had been involved in this case, and certainly if I knew then what I know now, I am struck that Mr. Parsley is an individual who is remorseful, would have come into court and pled guilty, and if there was a dispute over what the presentence report should contain, that the dispute would not have -- would have been resolved in the sentencing process. I believe that this Court has said many times that it's the very rare case where a defendant benefits by trying to dispute sentencing issues during the trial, and this may be one of those examples.

(Sentencing Tr. at 12-14.) In summing up he explained:

Also, as [the prosecutor] points out, that, in fact, when he met with probation for the presentence interview, there was not an attorney with him, and so that just strengthens some of my earlier discussions to the Court about I didn't come to this case at a time -- that really dovetails with the situation that we understand that the guidelines legally give a point reduction for those who accept responsibility, but as the Court has said many times, this Court does not punish people who go to trial.

Having a trial remains an important Constitutional right, and although the guideline analysis may say that if you plead and you plead at a certain stage, there is a point reduction. The Court, I think, can still look at do you have a person who at the end of the day is accepting, and Mr. Parsley points out to me here he is accepting, and he is remorseful, and he is sorry and we would ask that the Court find the same.

(Id. at 26-27.)

First, it is clear that there is no tenability to an ineffective assistance claim against sentencing counsel on this score.  With respect to Attorney Maselli, if the sentencing judge believes that a further reduction in sentence would have occurred had Parsley pled open, then this record would provide a basis for a 28 U.S.C. § 2255 evidentiary hearing on the questions of whether or not counsel failed to advise Parsley about the advisability of proceeding with an open plea and leaving the drug quantity determination for the PSI preparation process and sentencing proceeding.  The factual dispute is whether or not Maselli advised Parsley to go to trial as the only way to dispute precise drug quantities or whether Maselli was acquiescing to Parsley's

9

insistence on a trial.  With the United States clearly not interested in a plea agreement that lowered Parsley's drug quantity exposure, the Government would have been in a position to generate the same evidence on drug quantity at sentencing that it did at trial.  It does not seem likely that the one point for acceptance of responsibility was going to be recommended by the Government on the basis of an open plea so the question boils down to whether or not this Court would have further reduced Parsley's sentence had he entered an open plea.  The prospect of this relief does not appear obvious or apparent to me from the record alone, although the United States is a little too dismissive of the idea that the Court may not have wound up at a sentence lower than 87 months.   However, if the Court determines that -- had Parsley "accepted responsibility" by entering an open plea --  the sentence would have been reduced, then a factual determination would have to be made regarding the advice Maselli gave to Parsley prior to trial.  However, since the Court already "reduced" the sentence by discounting the criminal history, the Court might not have been inclined to go below the 87-month sentence, which was at the high end of the already reduced guideline sentence, even if the defendant had pled guilty.  Absent prejudice of this nature, Maselli's performance vis-à-vis the advice given regarding the entry of a guilty plea is largely irrelevant.

**B.      Performance apropos the Michael Phillips testimony**

Michael Phillips testified on direct examination in some detail on issues surrounding Parsley's involvement in the marijuana conspiracy. He was asked and he answered:

> Q. And from that period of time, Mr. Phillips, April of '04 to January 17th, 2005, did you have an arrangement with Mr. Lapierre in which he would provide you marijuana and you would distribute it to others?
> A. Yes, sir.
> Q. And approximately how many pounds of marijuana were involved again from the period of time of one week after your arrest in April of '04 through January 17th, 2005?

10

> A. There was a lot beforehand but after my arrest maybe about 6,000 pounds.
> Q. And as part of that process did you become familiar with how the marijuana
> was obtained and how it was transported to you?
> A. Yes, sir.
> Q. And how did you become aware of that?
> A. Because I took part of the control over getting it over to America.

(Dec. 13, 2006, Trial Tr. at 99-100, Crim. No. 05-86-P-H, Doc. No. 407.)  Phillips went further

into details of the conspiracy operation:

> Q. How many times do you think you yourself, again from the period of time
> we're talking about, April of '04 to January 17th of '05, how many times do you
> think you met the runner bringing it down from Canada?
> A. 20 times.
> Q. How many times do you think Mr. Blondet performed that service?
> A. Again, this is just an estimate. Probably the same.
> Q. How about Mr. Blondet -- I'm sorry, strike that.
> Mr. Santoro.
> A. Probably about 10.
> Q. And how about Mr. Parsley.
> A. About seven.

(Id. at 110.)  Elaborating on Parsley's involvement, Phillips explained:

> Q. The times that Mr. Parsley served as the courier, are you aware of where he
> went, with whom he met?
> A. Yes, sir.
> Q. And how would you have obtained that information?
> A. Because I sent him there.
> Q. And did you talk to Mr. Parsley after he went?
> A. Yes, sir.
> Q. And when Mr. Parsley went on a trip would he deliver anything on your
> behalf?
> A. You mean to me or to somebody else?
> Q. Before he left to go on the trip.
> A. Yes.
> Q. Would he bring something with him?
> A. He would bring currency.
> Q. And when he returned would he have something to give you?
> A. He would have black hockey bags.
> Q. And what was contained in the black hockey bags?
> A. Marijuana.
> Q. And was Mr. Parsley paid for these services?
> A. Yes, sir.

11

> Q. How much was he paid?
> A. On an average of $50 per pound.
> Q. All right. On a per trip basis what's that work out to be?
> A. $5,000 for a hundred pounds.
> Q. So is that a typical trip that Mr. Parsley made, a hundred pounds?
> A. 90 percent of the time.
> Q. And what are the locations that you recall sending Mr. Parsley to?
> A. I sent him to Portsmouth, New Hampshire. I sent him to Connecticut. I sent
> him to Rhode Island. I sent him to Jay Peak, Vermont. And I sent him once to
> Portland but he ended up in New Hampshire around Portsmouth.

(Id. at 111-13.)  Phillips testified that after his arrest and initial conversation with Gauthier, he

participated in six of seven marijuana transaction that he did not disclose to Gauthier.  (Id. at

130-32.)  He explained that he used a hydraulic truck to pick up these shipments and that Parsley

and he did one pick up in Connecticut together with this vehicle.  (Id. at 133-34.)  Phillips also

indicated that Parsley went to Connecticut once on his own and to Rhode Island on his own.

(Id.)  He testified that these trips involved anywhere from 100 to 200 pounds of marijuana and

that Phillips personally paid Parsley for his services as a courier.  (Id. at 134-35.)

As for the performance of trial counsel, the trial transcript reflects a rigorous cross and re-

cross examination of Phillips by Attorney Maselli.  (See  Dec. 13, 2006, Trial Tr. at 165-241,

Crim. No. 05-86-P-H, Doc. No. 407.)    For instance,

> Q. You've also made tape recordings with a guy named Blondet, right?
> A. Yes, sir.
> Q. Now, Blondet, he's been your partner for a long time, right?
> A. Yes.
> Q. How long?
> A. Since I met him in Vermont when I started buying marijuana from him.
> Q. So you were buying marijuana first from him.
> A. Yes.
> Q. And then you went into partnership with him?
> A. Yes.
> Q. And during the course of this investigation you've set up Mr. Blondet, correct?
> A. Set him up, you said?
> Q. Yes.
> A. Yes, sir.

Q. And you had a number of tape recorded conversations with your partner, Mr. Blondet, right?

A. Yes, sir.

Q. And you were pretending to set up a deal, correct?

A. Yes, sir.

Q. And in fact you set up a deal that directly resulted in him being busted with a large quantity of marijuana, correct?

A. It wasn't him being busted, it was Mr. Santoro, but it led to his arrest.

Q. Okay. So Brent Santoro was running, picking up marijuana for Mr. Blondet.

A. Yes.

Q. And before you had Mr. Blondet set up in this arrest, you had him on tape on a number of conversations, correct?

A. Yes, sir.

Q. Where you were being friendly and lying to him, correct?

A. Yes, sir.

Q. And in fact you got him -- it -- you didn't just set him up to get arrested for marijuana, you got him to raise all the money he could get together, a hundred thousand dollars, right?

A. Yes.

Q. And you had him make sure that money was confiscated, correct?

A. Yes.

Q. And this was all so that you would look good to help you get a lesser sentence in this conspiracy, correct?

A. Yes, I didn't want to set up Mr. Blondet, but I was -- it was insisted by Mr. Gauthier that it had to be done.

(Id. at 169-71.)  And, with respect to Parsley, defense counsel questioned Phillips in the following manner:

Q. And then you brought up the name of Joey that you had said once -- you sent this guy named Joey once to do something for you in the marijuana business.

A. Yes.

Q. Do you remember that?

A. Yes.

Q. So as you were testifying earlier that he was -- there was a good guy that you respected that you wanted to keep him out of it.

A. Yes.

Q. The very first interview that you had you've already brought him into it as a marijuana dealer.

A. Well, the situation seemed very familiar, and I told the agents basically what they wanted to hear to let me go.

Q. Okay. You were protecting him, though, right?

A. I was -- I was trying to after that. It was a mistake.

Q. So then you left that meeting with Agent Gauthier, right?

13

A. Yes.

Q. And whoever else you met with that day, told all kinds of information and you said we'll see you soon, right?

A. Yes.

Q. We'll be in touch. And you went right back to dealing marijuana again.

A. Yes, sir.

Q. Right back into your -- into your relationships.

A. Yes.

Q. But you didn't tell people that you had been arrested.

A. No.

Q. So you're playing the police on one side, right, you're playing all of your associates and people you know on the other, right?

A. Well, I was trying to establish a better relationship so I could help the Government further.

Q. Oh, I see. So really the -- the motive of working on marijuana deals after your arrest was to better help the Government?

A. In my twisted mind it was, yes.

(Id. at 190-92.)  Attorney Maselli elicited an affirmation by Phillips that he lied under oath to the

grand jury when he denied that he knew 'Buddy's' real name.  (Id. at 213.)  And he explored

Phillips's considerable self-interest in testifying at Parsley's trial and his penchant for lying:

Q. When's the last long meeting you had with the Government?

A. In September.

Q. This September. And despite all of the lies that you've testified to today, mostly from Mr. Perry's examination as well as other things that have come up, you're still hoping to get your sentence reduced, correct?

A. I hope but I don't think it's going to matter.

Q. You hope. And your best hope is to testify at this point against Mr. Parsley; isn't that right?

A. Yes.

Q. And as you said when Mr. Perry asked you, you said I can't help it, I'm a liar, right?

A. Yes.

Q. And so under those circumstances, no matter what you say, nobody could ever be confident that they can come back a year later and you say, well, that was a lie too, right?

A. I guess not.

(Id. at 228-29.)

14

In his closing argument, counsel zeroed in on what he characterized as the cooperating witnesses' "lies and the fabrications and the distortions," cautioning:

> Try as many years as you would, you could never find the truth from these witnesses.  Imagine if you had to make a life or death decision on someone that you loved based upon the testimony or the word of any of these people.  Would you willingly do it?  Never.  Never.  Joe Parsley's life hangs in the balance here today and what we do today, and the reliance upon these witnesses to convict Joe Parsley would not be justice but it's injustice of the highest magnitude.

(Dec. 14, 2006, Trial Tr. at 168, Doc. No. 408.)  He urged that the Government had not proved its case that Parsley willingly joined the conspiracy.  (Id. at 171-72.)  He pointed out that mere association or discussions between Parsley and the witnesses did not necessarily establish proof of the existence of a conspiracy charged in a particular count.  (Id. at 173 -74.)  Attorney Maselli highlighted that Parsley's association with Phillips originated in a window blind installation job by Parsley at Phillips's apartment.  (Id. at 174.)  He insisted that Phillips lied from day one concerning his involvement with law enforcement agents.  (Id. at 175.)  He described Parsley's activity on the day of Parsley's cashless Portsmouth trip as a decoy by Phillips who, "set up just about everybody in this case that he could."  (Id. at 177-80.)  He queried why, if Parsley was really a member in the conspiracy Phillips would not have arranged to set Parsley up like the others.  (Id. at 180.)   He summarized:

> Phillips and Blondet, they destroy everything that they touch. Friends, girlfriends, people they barely know, use them up and spit them out. Lapierre, the ex-lieutenant, investigator, millionaire. Now he's behind bars. But he's cooperating, he's to come here and tell the truth, he's probably got a lot of time off, he's probably going to get more time off probably from testifying here. It all works out for them. But they cannot destroy the life of Joe Parsley unless you let them. They have to go through you first.

(Id. at 189.)

15

As this Court knows from its own first-hand knowledge having presided over Parsley's trial, see McGill,11 F.3d at 225, the above is just an example of trial counsel's efforts to test the Government's reliance on Phillips's testimony.  As the United States points out, there was plenty of testimony from co-conspirators that corroborated Phillips's testimony as to drug quantities involved in the conspiracy and Parsley's involvement in the operations.   There are no grounds for concluding that trial counsel performed below the Strickland standard in regards to his approach to the testimony of Michael Phillips.

### 3.     *Prosecutorial Subornation of Perjury*

With respect to Parsley's next § 2255 issue, he faults the prosecution for suborning the perjury of Michael Phillips.  He explains that when Phillips testified that Parsley received 252 kilograms of marijuana on "each occasion" the prosecutor knew that Phillips was lying.  (Sec. 2255 Mem. at 8.)   In support of this claim Parsley maintains that Phillips made a proffer on January 14, 2005, in which he indicated that there were five deliveries in under a one-month period:  142 pounds; 120 pounds; 252 pounds; 162 pounds; and 122 pounds.  (Id.)  This totaled 778 pounds which supported a base offense level of 26 rather than 28.  (Id.)

The United States insists that, "Phillips never gave the testimony Parsley attributes to him." (Gov't Opp'n Mem. at 26 n.6.) It does seem that Parsley is confusing proffer notations made with his testimony at trial.  (See Doc. No. 1-3.)  Furthermore, as Parsley has now conceded that he was aware of his right to directly appeal his sentence and that there was so interference with this right on the part of counsel, see supra footnote 1, this claim has no 28 U.S.C. § 2255 viability because it is a claim that could have been but was not raised in a direct appeal.  See United States v. Frady, 456 U.S. 152, 167-68 (1982).

4.        *Reliance on Trial Testimony on Drug Quantity during Sentencing*

In another of his § 2255 grounds, Parsley maintains that this Court committed sentencing errors when it established a Base Offense Level of 28 premised on materially false testimony. He reiterates that the Government knew that the quantities of drugs that it attributed to Parsley were false yet it let this Court decide on a sentence based on this false attribution.

I have fully addressed trial counsel's performance apropos the challenge to Phillips's testimony above.  To the extent that Parsley believes that his sentencing attorney should have challenged the court's reliance on the testimony at trial, that would have been an argument surely rebuffed by this Court.[2]   See Acha, 910 F.2d at 32.  Sentencing counsel acknowledged this at the beginning of the sentencing hearing:

> I stepped into this case at the sentencing process, well after the
> presentence report has been drafted, well after all the times where counsel can
> intervene to ameliorate the harm have often has gone by the wayside. Some of his
> character -- and this Court sat through the trial so I will not seek to review the
> facts -- that is, the facts of the crime. The Court has an excellent memory on
> those, and was actually able to see the witnesses and to judge credibility and to

---

[2]        The Presentence Investigative Report (PSI) attributed the following offense related activity to him:
Conduct Attributed to the Defendant
          8. The Probation Office believes there is enough evidence based on the above paragraphs
to determine that Parsley was involved in the conspiracy from May 2004 through December 2004.
A total of 1,543 pounds of marijuana, contained in 43 hockey bags, was seized by agents during
the course of the investigation. This averages out to be 35.88 pounds per hockey bag. Each of the
individuals, from which these quantities were seized, had reported that they transported an average
of three bags per trip. The exception is Michaud, who was transporting five hockey bags of
marijuana per trip. Furthermore, a CI reported that the couriers were paid $5,000 per trip. The
defendant has been held accountable for seven trips, which is consistent with Phillips' testimony.
One trip with Roussel (3 hockey bags x 35.88 lbs. per bag = 107.64 lbs.), one trip with Bouchard
(1 hockey bag x 35.88 lbs. per bag = 35.88 lbs.), three trips with Michaud (15 hockey bags x 35.88
lbs. = 538.2 lbs.), one trip with Theriault (155 lbs. seized), and one trip associated with Chartrand
($5,000 (price paid to courier per trip) = 3 hockey bags or 107.64 lbs.). One pound of marijuana is
equivalent to .4536 kilograms of marijuana. Therefore, the defendant is held accountable for
**428.36 kilograms of marijuana** (107.64 lbs. + 35.88 lbs. + 538.2 lbs. + 155 lbs. + 107.64 lbs. =
944.36 lbs. x .4536 = 428.36 kilograms). The Probation Office believes this is a conservative
amount.
(PSI ¶ 8.)

17

hear that which the jury heard, perhaps to hear more than the jury heard depending on what was allowed and wasn't allowed at the trial.

(Sentencing Tr. at 11-12.)

### 5.     *The Helicopter Enhancement*

With regards to the helicopter enhancement, Parsley insists that he was not active in flying or operating any aircraft:  "When the helicopter service was charted by whomever, it became a common carrier and thus, this enhancement went beyond the spirit and intent of this guideline provision."  (Sec. 2255 Mem. at 9.)  In his § 2255 pleadings he faults both the Court and sentencing counsel for his receipt of this enhancement.  Even if this claim is repackaged as an ineffective assistance claim rather than a straight up challenge to the sentencing court's determination, it fails.

United States Sentencing Guideline 2D1.1(b)(2) provides:

If the defendant unlawfully imported or exported a controlled substance under circumstances in which (A) an aircraft other than a regularly scheduled commercial air carrier was used to import or export the controlled substance, or (B) the defendant acted as a pilot, copilot, captain, navigator, flight officer, or any other operation officer aboard any craft or vessel carrying a controlled substance, increase by 2 levels. If the resulting offense level is less than level 26, increase to level 26.

U.S.S.G. § 2D1.1(b)(2).  As to the helicopter's role in the conspiracy, Phillips testified as follows:

Q. Now, you indicated one of the methods that marijuana was brought into the country was by helicopter?
A. Yes.
Q. How was that arrangement established?
A. We didn't have anything going on for about a month and a half after the incident in Portsmouth, so Dan Lapierre organized something that had to do with a helicopter. So he called me up to Canada to discuss it, and he asked me to call up one of my friends to go up in the helicopter to scout locations because he didn't want me to go because he didn't want anything to happen to me. So I called up

18

Mr. Blondet and he drove up to Canada and me, Tommy, and Tommy's friend Dave and Dan drove to like the side of a ski mountain in -- north of Montreal, and Tommy boarded the helicopter and went to survey land around the border behind Jay Peak Mountain, Vermont. And he came back within an hour, and a week and a half after that we started to receive the marijuana by helicopter to one of three different locations that were predetermined.

Q. And how was it delivered to those locations that were predetermined?

A. By helicopter.

Q. But how would the -- would the helicopter drop them from the sky; was it landing?

A. The helicopter would land, I would run up, open the door, take the bags out, he would be gone within 30 seconds.

Q. Were you the only person who met the helicopter?

A. I met him, Tommy met him, Ben Pratt met him, Andre Chartrand met him, Joseph met him.

Q. When you say Joseph --

A. Joseph Parsley.

Q. How many times was the helicopter used?

A. 10 to 15 times.

Q. And how many times did Joseph Parsley pick up the bags from the helicopter?

A. He was with me on one occasion when I flew back to Canada in the helicopter, and he was with me on another location -- on another occasion when he drove the bags back down south.

Q. Now, one of the names you gave me sounded like it was Canadian, Andre Chartrand. Is he an American?

A. No, sir.

Q. Where did you meet Mr. Chartrand?

A. I originally met him in Canada. I had a meeting with Mr. Lapierre and he was trying to sell me outdoors and I didn't want to, but that was the first time I met him. Outdoors meaning outdoor marijuana.

Q. And how did Mr. Chartrand get involved in the process of picking up marijuana dropped in the helicopter?

A. I requested him.

Q. And why did you request him?

A. Because at first I couldn't hear the helicopter until it was above my head, and then once the leaves started to fall off the trees and winter started to come it got louder and louder, and I didn't feel safe having me or one of my American couriers going and picking up the marijuana. So Dan insisted on continuing to send it because it was easy for him. So I insisted that he send me a Canadian to start doing it for me.

Q. And did Mr. Chartrand get sent?

A. Yes, he did.

Q. And did he in fact undertake that process?

A. Yes, he did.

Q. What vehicle did he use?

19

A. He either rented a car at Thrifty but then Thrifty didn't want to rent him cars anymore, so the last time he used a car that Joey rented for him, for himself but he ended up using it because he couldn't get a car.

Q. And how did you become aware that Andre Chartrand was using a car rented by Joseph Parsley?

A. After border patrol pulled him over and arrested him.

Q. Him being Andre?

A. Him being Andre and his -- whoever he brought with him.

Q. Prior to that you were unaware that Andre Chartrand had Joseph Parsley's rental car?

A. I might have been, I'm not sure.

Q. Well, how would have Andre Chartrand met Joseph Parsley?

A. Because Andre was giving Joey the bags in Burlington and Joey was bringing them down to New York.

Q. And the bags were the bags that were being dropped by the helicopter?

A. Yes.

Q. What period of time are we talking about, Mr. Phillips?

A. From the end of August to the -- the first, second week in October, we used a helicopter.

Q. And -- '04?

A. Yes.

Q. Were all the trips that you sent Mr. Parsley on successful?

A. No.

Q. How many trips that you sent Mr. Parsley on were unsuccessful?

A. One.

Q. And tell us about that trip.

A. It was right after something happened with Mario and Luigi and it was about a week or two off. And Joey wanted to work so I -- we had somebody new that was going to bring the stuff down. And it was communicated with me over my Blackberry where and when it was going to be. I then sent Joseph up to Maine because it was originally going to be in Portland, Maine. But the courier was lost and he didn't meet at the right time, at which time Joey got nervous about the situation because the guy was late, and about what just happened a week and a half earlier. I assured Joey it was all right.

(Trial Tr. at 115-20; see also id. at 101,111, 115.)

The First Circuit Court of Appeals addressed the craft or vessel aspect of U.S.S.G.

§ 2D1.1(b)(2) in United States v. Rodriguez in the context of a drug conspiracy.  It reasoned:

[The defendant]  argues that the district court erred in determining his offense level under the United States Sentencing Guidelines because it applied a two-level enhancement under USSG § 2D1.1(b)(2)(B) (Nov.1998), which requires such an enhancement if "the defendant [has] acted as a ... captain ...

> aboard any craft or vessel carrying a controlled substance." [The defendant]
> argues that the enhancement would only have been appropriate if he had *actually*
> carried out the act of transporting drugs, but is not appropriate for mere
> conspiracy and attempt.
>
> The argument is frivolous. The offense level for the crimes of conspiracy
> and attempt is "[t]he base offense level from the guideline for the substantive
> offense, plus any adjustments from such guideline for any intended offense
> conduct that can be established with reasonable certainty." USSG § 2X1.1(a)
> (Nov.1998) (emphasis added). The adjustment in § 2D1.1(b)(2)(B) plainly is to be
> applied to convictions for conspiracy and attempt, so long as the necessary factual
> predicate for the enhancement exists. [The defendant] does not argue that the
> district court could not fairly have concluded that he was the captain of a boat
> intended to be used to carry marijuana. His argument is simply that the
> substantive crime was not committed. It simply does not matter whether he
> actually carried the controlled substance; his conspiring and his attempt to do so
> warrant the application of the enhancement.

215 F.3d 110, 124 (1st Cir. 2000).  The Third Circuit applied similar reasoning to the

aircraft prong of the guideline in United States v. Bethancourt, 65 F.3d 1074, 1080-81 (3d

Cir. 1995), as did the Eighth Circuit in United States v. Ray, 250 F.3d 596, 602 (8th Cir.

2001).  See also United States v. Bowe, No. 05-16333,  2006 WL 2271197, 5 (11th Cir.

Aug. 9, 2006); United States v. Iacullo, 04-11020, 2005 WL 1604976, 7 (11th Cir. July 7,

2005).   There is no basis for 28 U.S.C. § 2255 relief as to the application of this

guideline to Parsley. (See also Sentencing Tr. at 7, 34.)

### Conclusion

For the reasons above, I recommend that the Court deny Parsley 28 U.S.C. § 2255 relief.

I further recommend that no certificate of appealability should issue in the event Parsley files a

notice of appeal because there is no substantial showing of the denial of a constitutional right

within the meaning of 28 U.S.C. § 2253(c)(2).

NOTICE

21

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within ten (10) days of being served with a copy thereof.  A responsive memorandum shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

November 13, 2008.

/s/Margaret J. Kravchuk
U.S. Magistrate Judge